AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

<table>
<tr><td>
United States of America<br><br>
       v.<br><br>
AUDREY ILLEENE CARROLL,<br>
  aka "Asiginaak,"<br>
ZACHARY AARON PAGE,<br>
  aka "AK,"<br>
DANTE GAFFIELD,<br>
  aka "Nomad,"<br>
TINA LAI,<br>
  aka "Kickwhere,"<br><br>
       Defendants
</td><td>
Case No.  2:25-mj-07759-DUTY
</td></tr>
</table>

**FILED**
CLERK, U.S. DISTRICT COURT

12/13/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ jm ___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of December 12, 2025, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy |
| 26 U.S.C. § 5861(d) | Possession of Unregistered Destructive Device |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Carolyn Thompson*
*Complainant's signature*

Carolyn Thompson, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  December 13, 2025 at 4:33 PM

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Michael B. Kaufman, U.S. Magistrate Judge
*Printed name and title*

AUSAs: Ian V. Yanniello, Amanda B. Elbogen, Daniel H. Weiner

## AFFIDAVIT

I, Carolyn Thompson, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed as such since July 2024.  I am currently assigned to a Joint Terrorism Task Force Squad at the West Covina Resident Agency of the Los Angeles Field Office.  During my career, I have participated in multiple criminal and national security investigations, to include those involving the use of digital devices and online accounts to facilitate violations of federal law.  Through the course of my training and employment with the FBI, I have used a variety of investigative techniques and resources, including the execution of search warrants and review of both physical and digital evidence collected from search warrant returns.  I am familiar with the strategy, tactics, methods, tradecraft, and techniques of criminals, terrorists, and their agents.

2.   During my employment with the FBI, I attended New Agent Training at the FBI Academy in Quantico, Virginia from July to December 2024.  I have received additional formal and informal training from the FBI regarding criminal and counterterrorism investigations, including training concerning the use of electronic communications and digital devices in furtherance of a crime.  Furthermore, during my employment with the FBI, I have investigated federal criminal violations involving threats of violence involving the internet and online

accounts.  During these investigations, my duties included
participating in search warrants, electronic and physical
surveillance, and electronic analysis.  I have also conducted
numerous investigations in which the seizure of electronic
devices and review of electronic evidence have aided in
identifying individuals responsible for or involved with various
criminal activities.  I have been involved in the investigation,
apprehension, and prosecution of individuals who use electronic
devices to commit federal offenses.  I further understand the
technology that can be used by law enforcement to assist in
identifying the users of electronic devices and their locations.
I have also consulted with other law enforcement officers and
agents with extensive experience in investigating cases
involving domestic terrorism and threats to life and property.

## II. PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of arrest warrants
and a criminal complaint against AUDREY ILLEENE CARROLL also
known as ("aka") "Asiginaak," ("CARROLL"), ZACHARY AARON PAGE
aka "AK" ("PAGE"), DANTE GAFFIELD aka "Nomad" ("GAFFIELD"), and
TINA LAI aka "Kickwhere" ("LAI"), for violations of 18 U.S.C.
§ 371 (Conspiracy) (Count One); and 26 U.S.C.
§ 5861(d)(Possession of Unregistered Destructive Device) (Count
Two) on or about December 12, 2025.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested warrants and criminal complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.    In late November 2025, CARROLL, a member of the Turtle Island Liberation Front ("TILF"), provided a Confidential Human Source ("CHS")[1] an eight-page, handwritten document titled "OPERATION MIDNIGHT SUN" that described a bombing plot.  Another TILF member known as "AK," who was later identified as PAGE, was also present during the meeting.  Specifically, the plan contemplated planting backpacks with "ieds," or Improvised Explosive Devices, to be simultaneously detonated at five locations targeting two U.S. companies at midnight on New Year's Eve 2025 in the Central District of California.  The handwritten plan stated the "ieds" would be "complex pipe bombs," included instructions on how to manufacture the bombs, and included guidance to avoid leaving evidence behind that could be traced back to the co-conspirators.  CARROLL also discussed with the

---

[1] The CHS is cooperating with law enforcement and is a validated and vetted source.  The CHS has been a reliable source of information since in or around August 2021.  The CHS is cooperating for financial compensation.  The CHS does not have any criminal history.  The CHS provided past reliable reporting on other cases, and has provided reliable reporting in this case.

CHS the prospect of testing the explosives "in the desert" in mid-December 2025.

6. Since the initial meeting where the bomb plot was discussed, CARROLL and PAGE recruited other co-conspirators to the plot, including LAI and GAFFIELD. The co-conspirators then took numerous steps toward executing the bombing plot, including acquiring bomb-making materials and traveling to a remote location in the Mojave Desert to construct and detonate test explosive devices on December 12, 2025. While in the desert, the co-conspirators took steps to begin construction of the devices, including unloading the bomb-making materials (e.g., precursors, PVC pipes, and fuses) from their cars and beginning to assemble the materials on a table; constructing a tent to keep the bomb materials shaded from the sun; wiping down the interior of one of the PVC pipes; and CARROLL began discussing grinding a precursor for use in an explosive powder. FBI agents intervened and arrested CARROLL, PAGE, GAFFIELD, and LAI before they completed assembling a functional explosive device.

### IV. STATEMENT OF PROBABLE CAUSE

7. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Background on the Turtle Island Liberation Front ("TILF")**

8. According to a social media page titled "Turtle Island Liberation Front – LA Chapter," TILF is dedicated to "Liberation through decolonization and tribal sovereignty." According to

open-source information, "Turtle Island" is a term used by some Native Americans to describe the North American continent. According to open source information and other evidence gathered during the investigation, TILF is an anti-capitalist, anti-government movement. As discussed below, based on information from the CHS, the co-conspirators were participants in a Signal messaging group called the "Order of the Black Lotus," which CARROLL described as a "radical" faction of TILF. Among other things, the co-conspirators have used the Black Lotus group chat to discuss the bombing plot, including their plan to test explosive devices on or about December 12, 2025 in the Mojave Desert.

9. As discussed below, CARROLL operates the @turtleislandliberationfrontla Instagram account for TILF (the "TILF Instagram") that publicly posts content that advocates for violence against United States officials. Specifically, according to the FBI's review of publicly-available information from the TILF Instagram account, content on the account references that TILF calls for liberation of their lands and people, and decolonization and tribal sovereignty. TILF also calls for the working class to rise up and fight back against capitalism. Moreover, TILF advocates that liberalism and peaceful protest will be the downfall of those who believe it is enough, and that "direct action is the only way." For example, the caption of a post made on November 28, 2025 read "Revolution is the only way. Stop 'peaceful protest'ing. Rise up, fight back. We are not outnumbered, they are. Organize and be ready."

**B.    On November 26, 2025, the Co-Conspirators Distribute a Detailed Bombing Plot that Targets U.S. Companies**

10.    On November 26, 2025, the CHS met with two TILF members: a member known as "Asiginaak," who was later identified as CARROLL, and a member known as "AK," who was later identified as PAGE.  During the meeting, CARROLL provided the CHS with an eight-page, handwritten document containing the title "OPERATION MIDNIGHT SUN."  The CHS also saw that CARROLL appeared to possess three to four additional copies of the handwritten document.  Within the document the CHS was provided, there were five target locations identified, classified as "marks," with five additional blank slots observable under the caption "add more if enough comrades."  The target locations were identified as property and facilities operated by two separate companies that are used or engaged in activities affecting interstate and foreign commerce.

11.    Based on my review of the handwritten plan, the document outlined a plan of operation and identified that there would be teams of four "otg," or on the ground participants, plus one additional person who would assist the "otg" co-conspirators (the "off ground" member).  Specifically, three members of each team would plant "backpacks with ieds at different points along their assigned buildings."  The listed "ieds" would be "complex pipe bombs."[2]  One member of each team would create graffiti of a "red triangle and 1 message of the

_____

[2] Based on the information contained in the attack plan, I understand "complex pipe bomb" to refer to multiple explosive devices affixed to one another to make a larger explosive device.

team's choosing on the sidewalk closest to the building while the other 3 are placing the devices." The designated "off ground team member" was assigned to be listening to police scanners or in a vehicle in case "an emergency get away is needed." The written plan instructed that the bombs were to be detonated simultaneously on New Year's Eve 2025 (i.e., December 31, 2025).

12. The plan described multiple operational security measures the co-conspirators should take to conceal their identities, such as the use of a burner phone that would be disposed of after the bombings by "submerging it in a concrete brick after destroying the sim and then disposing of the brick in a body of water." The target date of the operation, New Year's Eve, was identified as an opportune time because "fireworks will be going off at this time so explosions will be less likely to be noticed as immediately as any normal day." The plan emphasized that "absolutely no mistakes can be made." The plans outlined the use of "BlacBloc"[3] overtop of a layer of "grey/casual bloc" on top of normal street clothes, and noted to keep hair very tightly concealed and to wear gloves for the purpose of avoidance of leaving behind DNA. The plan further instructed that participants should leave their personal devices at home and to make sure the devices were set up to stream a long movie during the time of the attacks, so as to craft an

---

[3] BlacBloc refers to a tactic whereby protestors wear black and concealing clothing like masks to protect their identity and project a sense of unity.

alibi or "plausible deniability" by having it appear as though the actor was actively using their devices.

13.   The plan discussed pre-operational surveillance of targets, identification of "debloc" or de-clothing locations, and not leaving "anything other than the ieds behind," as they could not "risk any evidence tracing back to us."  The plan also noted the benefit of placing a small pebble in a shoe to alter natural gait to obfuscate their identification.  Instructions on how to purchase materials to construct a pipe bomb suggested using cash only, purchasing in small quantities to avoid suspicion, and splitting purchases amongst a team rather than individually.

14.   In addition to the plan of action and operational security tactics, detailed instructions were provided on the components required to build a pipe bomb, as well as how to create homemade gun powder.  The details identified a step-by-step method of crafting the pipe bombs, the source ingredients and ratio of source ingredients of gun powder, the tools necessary to effectively produce gun powder, and general safety tips for the production of the explosives.  Based on information from FBI bomb technicians, I understand that the bomb-making instructions, if followed, would likely create an operational explosive device.

### C.   CARROLL Discusses the Attack Plan With Other Co-Conspirators, Including Co-Conspirators 1 and 2

15.   Based on information from the CHS and review of the audio recording from the meeting, on the evening of December 2,

2025, another in-person meeting occurred between the CHS, CARROLL, and PAGE. In addition, Co-Conspirators 1 and 2 --- each of whom had a TILF alias --- were present at the meeting. The meeting occurred in or around downtown Los Angeles. At the meeting, which was intended as an opportunity to produce content for a separate group, the CHS saw CARROLL provide a copy of the handwritten document containing attack plans to Co-Conspirator 1. Co-Conspirator 1 acknowledged the plan and expressed concern about the timeline, indicating they were running out of time to complete the plan.[4] The CHS also identified that Co-Conspirator 2 was likely aware of the plan, but did not make additional comment. CARROLL stated that Co-Conspirator 2 could not do stuff with them but could provide off-ground support such as monitoring police scanners. Co-Conspirator 1 returned the plans, as CARROLL wanted to keep the copy to make additional copies. Co-Conspirator 2 was present for the described interaction and discussions between CARROLL and Co-Conspirator 1.

16. At approximately 11:30 p.m., FBI agents conducting surveillance saw CARROLL depart the downtown Los Angeles location with Co-Conspirator 2, and followed them to a motel in

---

[4] The CHS believed the document was the same as the bomb instructions CARROLL previously gave the CHS because it consisted of the same kind of paper, was written in the same blue ink as the bomb instructions document, as well as Co-Conspirator 1's comment regarding the timeline of the plan. When CARROLL first handed the document to Co-Conspirator 1, Co-Conspirator 1 asked if the plan was for that same night. CARROLL said it was for the end of the year, that it was the official plan, and that CARROLL had given it the code name OPERATION MIDNIGHT SUN.

the Pico-Robertson neighborhood of Los Angeles, more than ten miles away from the downtown location where they were first dropped off. FBI surveillance saw Co-Conspirator 2 shortly thereafter with no passengers in their car, which indicated that CARROLL had been dropped off at the motel.

### D. The Co-Conspirators Meet on December 7 to Further Discuss the Bombing Plot and Their Intent to Conduct Future Attacks on Federal Officials

17. Based on information from the CHS and FBI personnel, including an undercover FBI employee ("UCE") who was present during the meeting, I know the following:

a. On or about the early morning of December 7, 2025, the CHS and the UCE met with CARROLL, PAGE, and a male known to the group as "NOMAD," later identified as DANTE GAFFIELD ("GAFFIELD"). CARROLL stated she had "the plan" and handed GAFFIELD four sheets of paper with writing on the front and back of each page, which GAFFIELD and the UCE read. The UCE later told law enforcement that the papers contained detailed instructions on how to construct a black powder pipe bomb.

b. Following GAFFIELD's review of the attack plans, CARROLL asked him whether some of his comrades would be on his team. GAFFIELD responded that he would talk to them. As discussed further below, GAFFIELD was added to the Black Lotus Signal chat group, which the co-conspirators used to discuss logistics for the testing of their explosive devices in the desert, among other things.

c. CARROLL then took back the hand-written document, stating it was the only copy she currently had and that she

10

would make more copies if GAFFIELD and the UCE wanted to be part
of the operation.  In response to a question from the UCE,
CARROLL said that she had conducted the research for the black
powder instructions in the IED plan.  CARROLL also acknowledged
including guidance in the plan for co-conspirators to place a
pebble in their shoe to change their gait.

   d. PAGE told the attendees of the meeting that they
were doing things as cleanly as possible, and that it was
"100,000 percent" that the FBI would be onto them.

   e. CARROLL discussed some of the co-conspirators who
would take part in the bombing.  Specifically, CARROLL stated to
the attendees that Co-Conspirator 1 would participate in the
operation, and Co-Conspirator 2 would be an "off the ground"
member --- referring to the co-conspirators assigned to monitor
police scanners while other co-conspirators set and detonated
the bombs.

   f. CARROLL stated that she had acquired some
components, had 13 PVC pipes, and that she had bought potassium
nitrate on Amazon using a burner account that was scheduled to
be delivered on December 11, 2025.

   g. PAGE asked the attendees if they would be
interested in receiving firearms training from another group
that had training approximately one month ago and was willing to
train them (referring to TILF/Order of the Black Lotus) on the
use of firearms.

   h. CARROLL also told the meeting attendees that she
had a contact (whose identity is known to the FBI) who could

obtain unregistered ARs, which likely refers to Armalite pattern rifles.  CARROLL also stated that one TILF member is a former military servicemember who might be able to get them parts.

        i.    PAGE and CARROLL discussed plans for future attacks after the New Year's Eve bombings, namely, plans to commence targeting U.S. Immigration and Customs Enforcement ("ICE") agents and vehicles with pipe bombs beginning in January or February 2026, with CARROLL noting "that would take some of them out and scare the rest of them."

        j.    During the December 7, 2025, meeting, CARROLL also confirmed she operated the TILF Instagram account.  Among other things, CARROLL stated she met a co-conspirator, whose identity is known to the FBI, by using the TILF Instagram account.

        **E.    CARROLL, PAGE, GAFFIELD, LAI, and Other Co-Conspirators Use an Encrypted Messaging Application to Plan the Attack**

18.    Based on my review of Signal messages provided by the CHS and conversations with an FBI Special Agent involved in the debriefing of the CHS and other law enforcement personnel, I know the following:

        a.    On December 3, 2025, the CHS communicated with CARROLL using the encrypted messaging application, Signal.  In the messages, CARROLL provided a list that identified components, chemicals, and tools along with prices which would be required to create the pipe bombs needed to go through with the planned attack.  On the list of items, several bomb components were listed as being already purchased, or were

already designated to be acquired by another "comrade." CARROLL also stated that they should purchase a few burner phones, instructed to be "bought with cash only."

b.    Several co-conspirators, including CARROLL, PAGE, TINA LAI aka "Kickwhere," and GAFFIELD,[5] have used a messaging group on the Signal application that is titled, "Order of the Black Lotus." On December 5, 2025, CARROLL wrote that the Black Lotus Signal group was "our group for everything radical[.]"

c.    Among other things, the co-conspirators have used the Black Lotus group chat to discuss the bombing plot, including their plan to test explosive devices in the desert on or about December 12, 2025.

d.    On or about December 5, 2025, CARROLL forwarded instructions to the CHS for the desert explosive testing that were originally posted in the Black Lotus group by PAGE. The instructions included geocoordinates for the planned camp site, which correspond to a location in the Mojave Desert, specifically the Lucerne Valley, California. The instructions included a screenshot of a satellite map with markings depicting "where we will set up camp (C on the map above) and where we will test (T on the map above)."

e.    The instructions indicated there was a "morning group" and that PAGE would meet up with the group at night.

---

[5] Among other evidence, agents identified the co-conspirators based on surveillance, the monikers the co-conspirators used --- which they have used both during in person meeting and in the Signal chat group --- and/or business records, including locational data associated with cellular phones the co-conspirators were believed to have used.

PAGE assured the group that PAGE knew the desert extremely well. The instructions further stated, "the net [sic] day we will take my jeep NE to the T area for doing the thing. i will have a popup and table (both bigger than the last ones I brought, moon LOL) so we can setup under that and then use the hills for testing."

f.    PAGE's instructions to the group further stated that the group will only have two burner phones to use in case of emergencies and for directions on the way out.  Once everyone arrived, their phones would be put in a small cardboard box completely sealed with aluminum.  The phones would not be returned until the caravan was out of the campsite and back on the main road.

g.    On December 8, 2025, LAI, using the Signal alias "Kickwhere", wrote to the group and confirmed LAI would be going to the desert with the group, and had a cargo box on top of their vehicle that would fit camping gear.[6]

h.    On December 8, 2025, during an exchange about bringing shoelaces and/or cotton string, which, from the context of the conversation, was being discussed for the co-conspirators' use as a fuse for one or more explosive devices, LAI posted photographs depicting string and what appears to be multiple packages of shoelaces.

---

[6] Notably, while observing LAI's residence, agents saw a vehicle with a cargo box attached to the roof.

   i. In response to LAI asking what kinds of string was needed, PAGE stated "cotton string that can be braided together. It being cotton is the important part".[7]

   j. In response to CARROLL asking the group "someone's getting the wider diameter pvc too right? I have 13 of the 1 inch / 2.5 cm diameter already cut," LAI responded: "Yeah I need to get that. Can you remind me what diameter I need to bring?" CARROLL responded, "3, 4, or 5 inch" and "maybe a small amount of each if you can find some."

   k. On December 9, 2025, LAI sent the Black Lotus group chat a picture depicting twine which had been taken from inside a vehicle, stating she "had found a bunch of these, sisal I think? Will that work for what we need?"  PAGE responded that PAGE thought it would and that they could test it.

   l. On December 10, 2025, at approximately 3:29 p.m., PAGE messaged the group, stating that two of the ingredients were acquired for the recipe.  PAGE also confirmed the starter was being acquired that evening.  Based on my discussions with FBI agents conducting surveillance, I know that PAGE was under FBI surveillance at the approximate time this message was sent, and that agents saw PAGE obtaining a package from an Amazon pickup location located in Carson, California, at approximately 3:14 p.m., 15 minutes before PAGE sent the message.

---

[7] A previous version of this affidavit in support of search warrants authorized on December 11, 2025 included a typographical error in Paragraph 18(i) and (k) stating that CARROLL, instead of PAGE, made the above statements to LAI.

m.   Later that same day, on December 10, 2025, FBI agents saw PAGE purchasing pistol primers from a store in Irvine, California, dressed in a manner to obscure PAGE's identity, namely, wearing a medical mask, gloves, ball cap and long sleeve shirt.  Based on conversations with an FBI Special Agent Bomb Technician, the primers that PAGE purchased could serve as an initiator for an Improvised Explosive Device.

n.   On December 10, 2025, CARROLL replied to PAGE's message about obtaining supplies, writing that she checked the supplies "I'm getting and one was already delivered, gotta pick it up tomorrow but yayyyy."

o.   Regarding travel to the desert, PAGE wrote on December 10, 2025, "The other navigator, please have a burner phone (no phones besides burners and all phones except navigators to be wrapped in foil or a faraday bag for the entirety of the trip) and install OsmAnd. It is an open source maps, so no corporate tracking."

p.   On December 10, 2025, GAFFIELD wrote, "I have a few burners / But im saving for the big event / The big party [celebrate emoji]."

q.   On December 11, 2025, PAGE stated "after further research i retract my earlier statement of specializing in electrical work. i have the basics down but building circuitsis [sic] beyond me (which is needed for a digital timer) / There are rudimentary options still."

r.   In a direct message between CARROLL and the CHS, via Signal, on or about December 10, 2025 CARROLL stated, "I

kind of had this notebook where I wrote down multiple plans that never happened or got delayed / so it's like / my terrorist diary / lmaooooo / I have to get rid of that."

**F.    The Co-Conspirators Take Additional Steps to Obtain Explosive Precursors and Other Bomb-Making Components**

19.    According to Amazon records, on December 7, 2025, CARROLL purchased two five-pound bags of "Potassium Nitrate – 99% Pure Prilled $KNO_3$ - 5lbs - for Industrial & Technical Applications" to be delivered to the Amazon Counter at the Whole Foods located at 3377 S La Cienega Blvd, Los Angeles, California.  The Potassium Nitrate was delivered on December 11, 2025.

20.    Based on text communications the co-conspirators exchanged via Signal and information from agents conducting surveillance on LAI, I know that LAI picked up the box of Potassium Nitrate referenced in the paragraph above on or about December 11, 2025.

**G.    CARROLL, PAGE, GAFFIELD, and LAI Travel to the Desert to Construct and Detonate Explosive Devices**

21.    Based on my review of Signal messages provided by the CHS, conversations with an FBI Special Agent involved in the debriefing of the CHS and UCE, conversations with other law enforcement personnel involved in this investigation, my review of recorded conversations taken from the co-conspirators' vehicles, and my review of surveillance footage taken on December 12, 2025, I know the following:

a.   On the morning of December 12, 2025, CARROLL, PAGE, GAFFIELD, and LAI traveled to in or around the Lucerne Valley in two vehicles.

b.   For the majority of the trip to the desert, the CHS was in one car with CARROLL and LAI ("SUBJECT VEHICLE 1"), and the UCE was in the other car with PAGE and GAFFIELD (the "UCE Vehicle").

c.   In the UCE vehicle, PAGE discussed using cigarettes as a delayed fusing device for the explosives once they arrived in the desert.  In SUBJECT VEHICLE 1, CARROLL explained to LAI that the day's events were meant as a test run for the New Years' Eve bombing plot, which CARROLL described in detail, stating: "What we're doing will be considered a terrorist act."[8]

---

[8] In response to CARROLL's detailing of the New Years' Eve plot, LAI asked if there would be any people at the bombing target locations.  CARROLL responded in the negative, but noted that if they saw any people, such as a security guard at any of the locations, they would warn them.

22.   At approximately 10:00 a.m., the co-conspirators
arrived at the desert and began setting up a campsite, including
tents and table.   Based on information from the UCE and CHS,
CARROLL, PAGE, and LAI all brought bomb-making components to the
campsite, including various sizes of PVC pipes, suspected
potassium nitrate, charcoal, charcoal powder, sulfur powder, and
material to be used as fuses, among others.   Some of those
bomb-making components are depicted in the photographs below:

 

23.   Based on information from the UCE and CHS, shortly
after the co-conspirators began transferring the precursors and
other bomb-making components from their vehicles to the
campsite, CARROLL, PAGE, and LAI began setting up the
bomb-making materials on a table.   GAFFIELD and others set up a

tent behind the table to keep the bomb-making materials and the group shaded from the sun.  The co-conspirators also took out a bag of charcoal and prepared to start grinding one of the precursor powders that would be used to create an explosive black powder.  After the UCE alerted law enforcement with a pre-determined signal indicating that bomb testing was imminent, FBI personnel intervened and placed CARROLL, PAGE, GAFFIELD, and LAI into custody.

24.  Based on information from FBI personnel who searched the campsite, I know that the FBI seized, among other items, the following bomb-making material from the campsite:

        a.   Two containers of potassium nitrate;

        b.   Charcoal and a bag of activated charcoal powder;

        c.   Sulfur powder;

        d.   Approximately 20 pieces of PVC pipe in multiple sizes, including pipes with 4-inch and 5-inch diameters;

        e.   A gallon jug and a water bottle containing gasoline;

        f.   5 glass bottles;

        g.   Bundle of twine in a bag, 7 cloth rags, and two cotton shirts; and

        h.   A respirator, goggles, and six boxes of primer.

25.  Based on an FBI Bomb Technician's review of the materials found at the co-conspirators' campsite, the FBI Bomb Technician determined that the components could likely be used to build both (1) improvised explosive devices and (2) Molotov

cocktail devices, and that the components were readily assemblable.[9]

**H.    Federal Search Warrants Executed at the Co-Conspirators' Residences Yield Additional Evidence of the Conspirators' Plans**

26. Based on my conversations with other FBI agents involved in the investigation and a review of photographs taken from the searches described below, I am aware of the following. On December 12, 2025, law enforcement executed search warrants at the co-conspirators' residences and seized, among other items, the following:

\\

\\

\\

---

[9] Based on conversations with the Bomb Technician, while no "end caps" were found at the campsite, the co-conspirators could have improvised using other material to plug the end of the PVC pipe, although such method would have been less effective than using a proper end cap. As noted above, there were also sufficient parts to create several Molotov cocktail devices.

a.   In CARROLL's residence, posters and materials associated with TILF, as depicted in the below photograph:



b.   In PAGE's residence, a copy of the hand-written attack plan (i.e., Operation Midnight Sun) detailing the bombing plot for New Years' Eve 2025;

c.   In GAFFIELD's residence, a Taser device that law enforcement records indicate had been stolen from the U.S. Federal Protective Service; and

d.   In LAI's residence, a metal saw next to shards of PVC pipe, additional pieces of PVC pipe (along with receipts

showing LAI purchased them), and hand-written notes reflecting ideologies aligned with TILF.

### I. The Co-Conspirators Did Not Register Any Destructive Devices with the National Registration and Transfer Record

27. Based on a records check conducted by Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") personnel on December 11, 2025 there is no record of CARROLL, PAGE, GAFFIELD, or LAI registering any destructive device with the National Registration and Transfer Record.

### V. CONCLUSION

28. For all the reasons described above, there is probable cause to believe that CARROLL, PAGE, GAFFIELD, and LAI committed violations of 18 U.S.C. § 371 (Conspiracy) (Count One); and 26 U.S.C. § 5861(d) (Possession of Unregistered Destructive Device) (Count Two) on or about December 12, 2025.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 13th day of
December, 2025.

_____

HONORABLE MICHAEL B. KAUFMAN
UNITED STATES MAGISTRATE JUDGE